IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

JERRY D. CANADA                                                    PLAINTIFF


V.                            NO. 10-5118


MICHAEL J. ASTRUE,
Commissioner of the Social Security Administration          DEFENDANT


### MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of the Social Security Administration (Commissioner) denying his claim for a period of disability and disability insurance benefits (DIB) under the provisions of Title II of the Social Security Act (Act).  In this judicial review, the Court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision.  See 42 U.S.C. § 405(g).

**I.      Procedural Background:**

On May 4, 2004, Plaintiff filed an application for DIB, alleging disability beginning June 16, 2000.  (Tr. 62).  The application was denied initially.  However, on reconsideration, Plaintiff's claim was allowed by the state agency on May 24, 2006, with an onset date of September 1, 2005.  (Tr. 34-35).  Plaintiff then timely requested a hearing on July 7, 2006, alleging that the correct onset date was June 16, 2000.  (Tr. 11).

-1-

Plaintiff previously filed applications for DIB and supplemental security income (SSI) on September 25, 2002, which were denied initially and on reconsideration. Upon request, a hearing was held before an administrative law judge (ALJ) on August 14, 2003. On October 22, 2004, an unfavorable decision was issued, and the Appeals Council denied Plaintiff's request for review. (Tr. 11). Therefore, October 23, 2003, the day after the last ALJ decision, will be considered the onset date.[1] The issue now before the Court is whether Plaintiff was disabled during the period from October 23, 2003, to September 1, 2005. (Tr. 11). An administrative hearing on this issue was held before an ALJ on August 30, 2007, at which Plaintiff appeared with counsel and testified. (Tr. 651-658).

By written decision dated April 1, 2008, the ALJ found Plaintiff had the following severe impairments between October 23, 2003, and September 1, 2005 - osteoarthritis and non-insulin dependent diabetes mellitus with diabetic neuropathy. (Tr. 13). However, after reviewing all of the evidence presented, the ALJ determined that Plaintiff's impairments did not meet or equal the level of severity of any impairment listed in the Listing of Impairments found in Appendix I, Subpart P, Regulation No. 4. (Tr. 14). The ALJ further found that during the relevant time period, Plaintiff had the residual functional capacity (RFC) to:

> occasionally lift/carry 20 pounds and frequently 10 pounds. He could push/pull within those same limitations. He could sit for 6 hours and stand/walk for 2 hours. He could not operate foot pedals. He could occasionally climb stairs, but cannot climb ladders, ropes, or scaffolds. He could occasionally crawl, crouch, stoop, kneel, and balance.

(Tr. 14). With the help of a vocational expert (VE), the ALJ determined that Plaintiff was unable to return to his past relevant work, but that there were jobs in the national economy that Plaintiff

---

[1]At the August 30, 2007 hearing, Plaintiff's counsel amended the onset date to October 23, 2003.

would be able to perform, such as production worker, call out operator, and charge accounting clerk.  (Tr. 17-18).

Plaintiff then requested a review of the hearing decision by the Appeals Council, which denied that request on May 11, 2010.  (Tr. 4-6).  Subsequently, Plaintiff filed this action.  (Doc. 1).  Both parties have filed briefs, and this case is before the undersigned for report and recommendation.  (Docs. 8, 9).

**II.    Evidence Presented:**

Plaintiff was born in 1959 and went to the seventh grade in school.  (Tr. 62, 82, 125). He has past relevant work as a roofer.  (Tr. 83, 656).  Plaintiff alleged disability, with an onset date of October 23, 2003, due to a back injury, back pain, foot pain, osteoarthritis, diabetes mellitus, diabetic neuropathy, heart problems, depression, anxiety and panic attacks.  (Tr. 129-130).

Since the only issue before the undersigned is whether Plaintiff was disabled during the time from October 23, 2003, to September 1, 2005, the Court will address only those records that are relevant to that determination.[2]

On February 19, 2004, Plaintiff presented himself to Hastings Indian Hospital, complaining of dizziness with exertion.  (Tr. 188).  On February 29, 2004, tests were run on Plaintiff at the Oklahoma Heart Institute, one of which was a carotid duplex imaging.  (Tr. 189). The impression from that test was: 1.  No hemodynamically significant lesion in either carotid system; and 2.  Forward flow in both vertebrals.  (Tr. 189).  An echocardiographis report

---

[2]The Court notes that Plaintiff suffered from an ulcer on his left foot in 2003, which healed properly.  (Tr. 193, 195-196).

AO72A
(Rev. 8/82)

revealed:

1.  Sinus rhythm;
2.  Grossly normal left ventricular size and systolic function.  Estimated ejection fraction equal to or greater than 55%.  Cannot exclude wall motion abnormalities with this study.  Upper limits of normal ventricular thickness. Unable to assess diastolic function.
3.  The right ventricle is not well visualized.
4.  Normal atrial sizes.
5.  The aortic root is normal sized.
6.  The aortic valve appears trileaflet.  There is no stenosis or insufficiency.
7.  The mitral and tricuspid valves are not well seen.  There is no obviously significant regurgitation.
8.  The pulmonic valve is not well seen.
9.  There is no pericardial effusion.
10.  The inferior vena cava is normal sized and collapses with inspiration, suggesting a normal right atrial pressure.
Conclusions:
1.  Technically difficult study.
2.  Grossly normal left by ventricular size and systolic function.  Estimated ejection fraction is equal to or greater than 55%.
3.  No obviously significant valve disease.

(Tr. 191).

On May 26, 2004, x-rays were taken of Plaintiff's foot at Wilma P. Mankiller Health Center, which revealed calcineal spurs.[3]  (Tr. 642).

On June 24, 2004, a General Physical Examination was conducted by Dr. Tad Michael Morgan.  (Tr. 207-213).  Dr. Morgan noted that Plaintiff had previously been diagnosed with non-insulin dependent diabetes mellitus, and had degenerative disc disease.  (Tr. 207).  He also noted that Plaintiff was a smoker, but was trying to quit.[4]  (Tr. 207).  Dr. Morgan found that Plaintiff had normal range of motion in his cervical and lumbar spine and extremities, and had

---

[3]Calcineal spur - A bone excrescence on the lower surface of the calcaneus which frequently causes pain on walking.  Dorland's Illustrated Medical Dictionary 1783 (31st ed. 2007).

[4]The Court notes, however, that a record dated September 15, 2005, indicates that Plaintiff was smoking approximately one pack per day at that time, and that Plaintiff also smoked marijuana.  (Tr. 262).

-4-

decreased sensation (vibratory and pin prick) in both feet, the left greater than the right.  (Tr. 210-211).  Dr. Morgan also noted that Plaintiff's gait, coordination and limb function were all normal.  (Tr. 211).  He diagnosed Plaintiff with:

1. NIDDM (non-insulin dependent diabetes mellitus) with diabetic neuropathy; and
2. Back injury with secondary back pain (chronic).

(Tr. 213).  Dr. Morgan also noted that Plaintiff had "moderate disability to walk, lift, carry and stand for prolonged periods."  (Tr. 213).

An ankle brachial index test with doppler was performed on June 25, 2004, which revealed that Plaintiff's right leg appeared to have mild arterial obstruction, and his left leg appeared to have normal arterial flow.  (Tr. 214).  All of Plaintiff's toes appeared normal at that time.  (Tr. 216-217).

On July 13, 2004, a Physical RFC Assessment was completed by non-examining Dr. Alice Davidson.  (Tr. 219-226).  Dr. Davidson found that Plaintiff could occasionally lift and/or carry (including upward pulling) 20 pounds; frequently lift and/or carry (including upward pulling) 10 pounds; stand and/or walk (with normal breaks) for a total of about 6 hours in an 8-hour workday; sit (with normal breaks) for a total of about 6 hours in an 8-hour workday; and that Plaintiff's ability to push and/or pull (including operation of hand and/or foot controls) was limited in his lower extremities, with "occasional foot controls."  (Tr. 220).  Dr. Davidson also found that Plaintiff could occasionally climb ramp/stairs/ladder/rope/scaffolds, and occasionally balance, stoop, kneel, crouch, and crawl.  (Tr. 221).  She also found that no manipulative, visual, communicative, or environmental limitations were established.  (Tr. 221-223).

On January 12, 2005, Plaintiff presented himself to Wilma Mankiller Health Center, with

AO72A
(Rev. 8/82)

an infected ulcer on his right great toe.  (Tr. 633).   X-rays of the foot revealed heel spurs and

"degenerative changes interphalangeal joint great toe adjacent to area of ulceration, with

questionable periosteal reaction versus pulmonary hypertrophic on osteoarthropathy." (Tr. 632).

On February 16, 2005, Plaintiff's right great toe was "debrided to bleeding,"[5] and

Plaintiff was to use a Fx walker (boot).  (Tr. 624).  On March 2, 2005, Plaintiff advised the

doctor that he was wearing the Fx walker most of the time, but cut wood that week without the

boot on.  (Tr. 621).  The report indicated that the wound was deeper down to the tendon, and that

the circulation tissue wound appeared dirty.  (Tr. 621).  It also stated that the wear of the shoes

worn inside the Fx walker was not consistent with regular use, and Plaintiff was told he needed

to wear the boot "at all times."  (Tr. 621).  On March 9, 2005, Plaintiff advised the doctor at

Wilma Mankiller Health Center that he had to walk a long way the previous day down a dirt road

secondary to his truck breaking down, and the wound was still large, with extension to the

tendon/some mild chronic discoloration.  (Tr. 623).  The doctor placed a short leg cast on

Plaintiff's foot in order to offload the toe.  (Tr. 623).  The wound continued to be debrided, and

on March 23, 2005, was reportedly significantly improved.  (Tr. 618).

On April 6, 2005, the wound was debrided and reported as improving significantly, and

was debrided again on April 20, 2005.  (Tr. 610, 614).  On May 4, 2005, Plaintiff presented

himself again to Wilma Mankiller Health Center, stating that two or three days prior to the visit,

he fell in a creek, and the cast got wet.  (Tr. 608).  There was maceration[6] to the entire plantar

aspect foot.  Although the wound had improved, the need for compliance was stressed, and

---

[5]Debride - To remove foreign material and contaminated or devitalized tissue, usually by sharp dissection.  Id. at 481.

[6]Maceration - The softening of a solid by soaking.  Id. at 1106.

Plaintiff was advised that his toe/foot were at risk. (Tr. 608). Plaintiff was told that he must wear the Fx walker at all times, and if there were signs of noncompliance at the next visit, his foot would be cast. (Tr. 608).

In May and June of 2005, Plaintiff's wound was debrided and slowly improving, until June 15, 2005, when a below knee cast was applied. (Tr. 599, 601, 603-604). On June 29, 2005, when Plaintiff presented himself to Wilma Mankiller Health Center, his foot was dirty, and the doctor advised Plaintiff that he could not put a cast on with skin in the condition it was in, and told Plaintiff he was to stay off his foot and use the Fx walker, or else he could lose the toe. (Tr. 591). On July 20, 2005, the doctor at Wilma Mankiller Health Center concluded that Plaintiff needed to be in a cast again, and on July 27, 2005, a short leg cast was applied. (Tr. 585, 587).

In a social security disability form dated June 2, 2004, Plaintiff reported that he was able to bathe, dress, shave and care for his hair without assistance, but could not walk around because of his feet swelling and pain in his feet. (Tr. 122). He stated that he used a cane because it helped him to function better. (Tr. 123). He further reported that his pain and poverty were causing him depression, and that he had severe extensive feet and back pain. (Tr. 125-126).

## III.    Applicable Law

This Court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. Ramirez v. Barnhart, 292 F. 3d 576, 583 (8th Cir. 2002). Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. The ALJ's decision must be affirmed if the record contains substantial evidence to support it. Edwards v. Barnhart, 314 F. 3d 964, 966 (8th Cir. 2003). As long as there is substantial evidence in the record that supports

AO72A
(Rev. 8/82)

the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently.  Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001).  In other words, if after reviewing the record, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed.  Young v. Apfel, 221 F. 3d 1065, 1068 (8th Cir. 2000).

It is well established that a claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental disability that has lasted at least one year and that prevents him from engaging in any substantial gainful activity.  Pearsall v. Massanari, 274 F. 3d 1211, 1217 (8th Cir. 2001); see also 42 U.S.C. §§423(d)(1)(A), 1382c(a)(3)(A).  The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. §§423(d)(3), 1382(3)(D).  A Plaintiff must show that his disability, not simply his impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require him to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant had engaged in substantial gainful activity since filing his claim; (2) whether the claimant had a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) met or equaled an impairment in the listings; (4) whether the impairment(s) prevented the claimant from doing past relevant work; and (5) whether the claimant was able to perform other work in the national economy given his age, education, and experience.  See 20 C.F.R. §416.920.  Only if the final

-8-

stage is reached does the fact finder consider the Plaintiff's age, education, and work experience in light of his residual functional capacity (RFC).  See McCoy v. Schweiker, 683 F.2d 1138, 1141-42 (8th Cir. 1982);  20 C.F.R. §416.920.

**IV.   Discussion:**

**A.  Impairments**

Plaintiff contends the ALJ failed to consider Plaintiff's impairments in combination, stating that the ALJ disregarded Plaintiff's testimony regarding back pain and discomfort, foot pain, blurred vision, hypertension and depression.  The Court does not agree.  In his decision, the ALJ specifically stated that he considered the entire record, and that from October 23, 2003, to September 1, 2005, Plaintiff had the severe impairments of osteoarthritis and non-insulin dependent diabetes mellitus with diabetic neuropathy, and that:

> From October 23, 2003, to September 1, 2005, the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

(Tr. 13-14).  This language indicates the ALJ clearly considered Plaintiff's impairments in combination.  See Hajek v. Shalala, 30 F.3d 89, 92 (8th Cir. 1994)(ALJ found claimant did not have impairment or combination of impairments equaling listing-level impairment and referred to evidence as whole and therefore, ALJ properly considered combined effect of impairments).

Also in his decision, with respect to Plaintiff's alleged mental limitations, the ALJ stated that he reviewed the medical records to determine if Plaintiff suffered from a mental impairment from October 23, 2003, to September 1, 2005, that would have limited his ability to perform work-related tasks, and that no significant impairments related to depressive symptoms were

-9-

found.  The ALJ further stated:

> Although the claimant testified at the hearing that he was prescribed anti-depressant medication, there is no evidence that he sought any mental health treatment or that he suffered from any mental impairment which would have significantly limited his ability to perform work-related tasks.  The undersigned finds that from October 23, 2003, to September 1, 2005, the claimant experienced mild restrictions of activities of daily living, mild difficulties in maintaining social functioning, and no difficulties in maintaining concentration, persistence, or pace, and that he experienced no episodes of decompensation of extended duration.

(Tr. 14).  It is clear that Plaintiff did not seek treatment from a mental health professional for depression on or before September 1, 2005, the date his disability benefits commenced, and doctors did not find it necessary to refer Plaintiff to a mental health professional for treatment of depression during the relevant time period.

Plaintiff also argues that the ALJ failed in not considering Plaintiff's alleged obesity. However, after conducting his general physical examination, Dr. Morgan did not diagnose Plaintiff with obesity, and Plaintiff failed to allege that obesity limited his capacity to perform work-related activity.  See McNamara v. Astrue, 590 F.3d 607, 611 (8th Cir. 2010)("Nothing in McNamara's medical records indicates that a physician ever placed physical limitations on McNamara's ability to perform work-related functions because of her obesity.").

With respect to Plaintiff's heart problems, the medical records during the relevant time period clearly reflect that Plaintiff suffered from dizziness with exertion on February 19, 2004. However, several tests were performed at the Oklahoma Heart Institute, which revealed no significant valve disease.  (Tr. 189-191).

With respect to Plaintiff's back pain and discomfort, blurred vision, or hypertension, there are no medical records which reflect that during the relevant time period, Plaintiff suffered

-10-

with these alleged impairments to such a degree so as to affect his ability to function in the workplace. In fact, Dr. Davidson's Physical RFC Assessment clearly set forth the limitations which were supported by the record at that particular time, which was during the relevant time period.

**B. Subjective Complaints and Credibility Analysis:**

The ALJ was required to consider all of the evidence relating to Plaintiff's subjective complaints, including evidence presented by third parties, that relates to: (1) Plaintiff's daily activities; (2) the duration, frequency, and intensity of his pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of his medication; and (5) functional restrictions. See Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). While an ALJ may not discount a claimant's subjective complaints solely because the medical evidence fails to support them, an ALJ may discount those complaints where inconsistencies appear in the record as a whole. Id. As the Eighth Circuit Court of Appeals observed, "Our touchstone is that [a claimant's] credibility is primarily a matter for the ALJ to decide." Edwards v. Barnhart, 314 F.3d 964, 966 (8th Cir. 2003).

After reviewing the record, it is clear that the ALJ properly evaluated Plaintiff's subjective complaints. In his decision, the ALJ stated that Plaintiff's statements concerning the intensity, persistence and limiting effects of his symptoms were not credible to the extent they were inconsistent with the RFC assessment. He stated: "The undersigned observes that the claimant did not receive the type of medical treatment one would expect for a totally disabled individual, and the record does not contain any opinions from treating or examining physicians indicating that the claimant was disabled." (Tr. 15). He further stated:

-11-

The ALJ has attempted to discharge his duty to find the nature, degree, and level of the claimant's subjective pain and other discomfort, and the functional restrictions which it imposes, by carefully considering all pertinent evidence in the record as a whole. This includes careful consideration of the claimant's testimony at the hearing. However, it appears from the weight and preponderance of all the credible evidence of record, including the medical evidence and testimony that the pain and discomfort factor is not of such persistence or severity as to be disabling from October 23, 2003, to September 1, 2005.

Although the claimant has described daily activities which were fairly limited from October 23, 2003, to September 1, 2005, two factors weigh against considering these allegations to be strong evidence in favor of finding the claimant disabled. First, allegedly limited daily activities cannot be objectively verified with any reasonable degree of certainty. Secondly, even if the claimant's daily activities were truly as limited as alleged, it is difficult to attribute that degree of limitation to the claimant's medical condition, as opposed to other reasons, in view of the evidence and other factors discussed in this decision. Overall, the claimant's reported limited daily activities are considered to be outweighed by the other factors discussed in this decision.

(Tr. 16). The ALJ did not discount all of Plaintiff's complaints, and recognized that Plaintiff did experience limitations from October 23, 2003, to September 1, 2005. However, given the objective medical evidence in the record, the ALJ found that Plaintiff's RFC was reasonable, and that he could have functioned within those limitations without experiencing significant exacerbation of his symptoms. (Tr. 16-17).

In addition, in March of 2005, Plaintiff reported cutting wood and walking a long distance after his truck broke down. (Tr. 623). In May of 2005, Plaintiff reported falling into a creek and getting his cast wet, but did not go to the doctor for two or three days. On June 22, 2005, Plaintiff reported that he had been walking a lot with his cast. Therefore, Plaintiff's activities during the relevant time period do not indicate disabling pain. Although his condition worsened later in 2005, the records indicate that in spite of the fact that Plaintiff was at times non-compliant in the way he cared for his foot, Plaintiff had been treated as an outpatient fairly

-12-

successfully prior to his foot infection.

The Court is of the opinion that substantial evidence supports the ALJ's credibility determination.

## C.    RFC Assessment

RFC is the most a person can do despite that person's limitations.  20 C.F.R. § 404.1545(a)(1).  It is assessed using all relevant evidence in the record.  Id.  This includes medical records, observations of treating physicians and others, and the claimant's own descriptions of his limitations.  Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005); Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004).  Limitations resulting from symptoms such as pain are also factored into the assessment.  20 C.F.R. § 404.1545(a)(3).  The Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001).  Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace."  Lewis v. Barnhart, 353 F.3d 642, 646 (8th Cir. 2003).  "[T]he ALJ is [also] required to set forth specifically a claimant's limitations and to determine how those limitations affect his RFC."  Id.

In the present case, the ALJ considered all of Plaintiff's symptoms, medical assessments of examining and non-examining agency medical consultants, Plaintiff's subjective complaints, and his medical records when he determined Plaintiff could perform light work with limitations between October 23, 2003, and September 1, 2005.  In making this RFC determination, the ALJ discussed the fact that the 2004 tests of Plaintiff's heart revealed no significant valve disease. He also relied upon the limitations placed on Plaintiff's ability to walk, lift, carry, and stand for

-13-

prolonged periods (moderate), as well as the fact that in 2004, all of Plaintiff's toes appeared normal. With respect to the ulcer on Plaintiff's right toe that bothered him in 2005, the records up until September of 2005 reveal that the ulcer was getting better, often times in spite of Plaintiff's failure to adequately care for it. The fact that Plaintiff testified that his activities during the relevant time period were limited to watching television and lying down is not consistent with some of his reported activity during the relevant time period.

Based upon the entire evidence of record, the Court is of the opinion that substantial evidence supports the ALJ's RFC findings.

**V.    Conclusion:**

The Court believes there is substantial evidence to support the ALJ's finding that Plaintiff was not disabled between October 23, 2003, and September 1, 2005. Based on the foregoing, the Court recommends affirming the ALJ's decision, and dismissing Plaintiff's case with prejudice. **The parties have fourteen days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 30th day of June, 2011.

/s/ *Erin L. Setser*
_____
HON. ERIN L. SETSER
UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)